UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LEONEL ROBINSON** | **CIVIL ACTION** |
| **VERSUS** | **NO: 02-1199** |
| **ORIENT MARINE CO., LTD.,** *ET AL.* | **SECTION: "S" (2)** |

### ORDER AND REASONS

**IT IS ORDERED** that the motion for summary judgment filed by Orient Marine Co., Ltd., Clio Marine, Inc., Oldendorff Carriers GmbH & Co., KG and the United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Limited (Document 54) (collectively "Oldendorff") is **GRANTED**.  The motion for summary judgment filed by defendants Pan Ocean Shipping Co. and the United Kingdom Mutual Steamship Assurance Association (Bermuda) Limited (Document 48) (collectively "Pan Ocean") is **DENIED.**

**A.    Background.**

Plaintiff Lionel Robinson, a stevedore injured while offloading cargo from the *Clio Pacific*, has sued Oldendorff, the owner of the vessel, and Pan Ocean, its time charterer, under

1

the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(b).  Both defendants have moved for summary judgment on Robinson's claims, contending that they satisfied their duties under *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).

On July 11, 2001, Pan Ocean executed a time charter for the *Clio Pacific* with Oldendorff.  The contract is a "New York Produce Exchange Form" charter, and provides in clause 8:

> The Captain shall prosecute his voyages with due despatch, and shall render all customary assistance with ship's crew and boats.  The Captain (although appointed by the Owners) shall be under the orders and directions of The Charterers as regards employment and agency; and Charterers are to Perform all cargo handling at their *risk and* expense under the supervision/responsibility of the Captain, who is to sign the bills of lading for cargo as presented in conformity with mate's or tally clerk's receipts (italics in original).

The charter contained numerous rider clauses.  Rider Clause 42 provides that "Stevedores to be appointed and paid by the Charterers but to work under the supervision of the Master," and Rider Clause 74 states that "The cargo to be loaded, stowed, dunnaged, lashed, unlashed and secured to the satisfaction and supervision of the Master free of expense to the vessel."

In August 2001, 18 crates of plywood were loaded aboard the vessel's number five hold in Samarinda, Indonesia by the stevedoring firm Pt. Budi Indi Rejeki.  The number five hold is the aft most hold of the vessel, and has a contoured wall shape corresponding to the tapering of the stern.  Consequently, the rectangular plywood bundles could not be stacked directly on top of each other.  A Pan Ocean employee, J.Y. Jeong, prepared the stowage plan for the cargo, and Jeong attests that the plan "generally instructed the loading stevedores which hold and in which

order to place the specific consignments of cargo."[1]  Pan Ocean's supercargo, Y.S. Kim, attended the loading of the vessel, giving the stevedores the Pan Ocean stowage plan and providing them with general guidelines as to how it should be followed.[2]  Kim attests that he "did not provide the Indonesian stevedores with any particular or specific instructions with regard to loading, lashing, stowage, or securing of any specific crate of cargo."

Plaintiff's employer, P&O Ports of Louisiana, assigned him to be a member of the gang discharging hold five of the *Clio Pacific* after it arrived in New Orleans on October 19, 2001. On October 20, 2001, a crate of plywood on which plaintiff was standing tipped over, causing him to fall and sustain personal injuries.  It is undisputed that the crate on which plaintiff stood was not placed directly over the cart beneath it, but instead was overhanging.

**B.      Analysis.**

    **1.      Summary judgment standards.**

Rule 56 provides that summary judgment "shall be rendered forthwith" if the pleadings and evidence demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The Supreme Court has held that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to prevent summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

---

[1]  Declaration under penalty of perjury by J.Y. Jeong (Exhibit "2" to Document 48).

[2]  Clause 10 of the charter provides that "The Charterers are entitled to appoint a supercargo, who shall accompany the vessel *in port, not at sea* and see that voyages are prosecuted with due dispatch" (italics in original).

that one party must prevail as a matter of law." *Id.* at 251-52.  The inferences the court may draw from the underlying facts in the affidavits, depositions, and exhibits "must be viewed in the light most favorable to the party opposing the motion."  *McAvey v. Lee*, 260 F.3d 359, 363 (5th Cir. 2001) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L.Ed.2d 176 (1962)).

> 2. **Defendants' liability under the Longshore and Harbor Workers' Compensation Act.**

Under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(b), an injured longshore worker has a negligence remedy against a vessel.  *Moore v. M/V Angela*, 353 F.3d 376, 379 (5th Cir. 2003).  The term "vessel" is defined in the LHWCA to encompass both the vessel's owner and "charter,"[3] which includes time charterers.  *Kerr-McGee Corp. v. Ma-Ju Marine Serv., Inc.*, 830 F.2d 1332, 1338 (5th Cir. 1987).

> a. **Vessel owner's motion for summary judgment.**

Under the LHWCA, a vessel generally "may rely on the stevedore to avoid exposing the longshoreman to unreasonable hazards," and "the primary responsibility for the safety of the longshoremen rests on the stevedore."  *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir.), *cert. denied*, 519 U.S. 865, 117 S.Ct. 173, 136 L.Ed.2d 114 (1996).

In *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Supreme Court held that a vessel owes three duties to a longshoreman under § 905(b):  (1) at the commencement of stevedoring operations, a duty to use ordinary care to turn over the vessel to the unloading stevedores to enable them to carry on cargo operations in reasonable safety, (2) after stevedoring operations have begun, a duty to prevent injury to

---

[3]   33 U.S.C. § 902(21).

longshoremen in areas remaining under the active control of the vessel, and (3) with regard to cargo operations in areas under the principal control of the stevedore, a duty to intervene in certain circumstances. *Id.* at 167-78.

Plaintiff contends that Oldendorff, the vessel owner, breached the turnover duty. The turnover duty "relates to the condition of the ship upon the commencement of stevedoring operations." *Moore*, 353 F.3d at 380. The turnover duty has two components. First, it requires the shipowner to:

> "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property."

*Howlett v. Birkdale Shipping Co., S.A.,* 512 U.S. 92, 98, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994). A "corollary" to the turnover duty requires the vessel:

> to warn the stevedore "of any hazards on the ship or with respect to its equipment," so long as the hazards "are known to the vessel or should be known to it in the exercise of reasonable care," and "would likely be encountered by the stevedore in the course of his cargo operations[,] are not known by the stevedore [,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work."

*Id.*; *see also Singleton*, 79 F.3d at 28 (turnover duty requires vessel owner "to warn on turning over the ship of hidden defects of which he should have known"). The duty to warn "must be defined with due regard to the concurrent duties of the stevedore and to the statutory scheme as a whole." *Howlett*, 512 U.S. at 99. The turnover duty "does not include dangers which are either (1) open or obvious, or (2) something a reasonably competent stevedore should anticipate encountering." *Clay v. Daiichi Shipping*, 74 F. Supp. 2d 665, 670 (E.D. La. 1999), *aff'd*, 237 F.3d 661 (5th Cir. 2000) (table); *see also Moore*, 353 F.3d at 381 (holding that an "exception to

5

the turnover duty applies if the defect causing the injury is open and obvious and one that the longshoreman should have seen.").

The turnover duty to warn "may extend to certain latent hazards in the cargo stow. This is so because an improper stow can cause injuries to longshoremen, and thus is among the 'hazards on the ship' to which the duty to warn attaches." *Howlett*, 512 U.S. at 98. The duty encompasses only hazards that are known or should be known to the vessel and would not be obvious or anticipated by skilled stevedores:

> [T]he vessel's turnover duty to warn of latent defects in the cargo stow and cargo area is a narrow one. The duty attaches only to latent hazards, defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work. Furthermore, the duty encompasses only those hazards that "are known to the vessel or should be known to it in the exercise of reasonable care." [T]he exercise of reasonable care does not require the shipowner to supervise the ongoing operations of the loading stevedore (or other stevedores who handle the cargo before its arrival in port) or to inspect the completed stow.

*Id.* at 105.

Under *Howlett* the vessel owners must exercise ordinary care to turn over the vessel such that an expert and experienced stevedore will be able to carry on cargo operations with reasonable safety. The testimony of P&O's superintendents and foreman demonstrates that the *Clio Pacific* was turned over to P&O in a manner permitting its crew to offload the plywood cargo with reasonable safety, and that the danger caused by overlapping plywood bundles was not a latent hazard because it was anticipated by the stevedores in the performance of their work. Steve Cabal, P&O's General Superintendent, testified that it is a "normal" occurrence for plywood bundles to overlap, and this sometimes occurs because of the beveled shape of the

hull.[4]  Richard Vanderbrook, the P&O Superintendent on the day of the accident, testified that in working with other vessels carrying plywood cargo, he had seen overlapping crates due to the contour of the vessel in the number one and number five holds, and that it was expected that cargo crates would be overlapping.[5]  Vanderbrook testified that normally he did not give his longshoremen special instructions about overlapping crates "because of the experience of longshoremen," and indicated that longshoremen "know, through experience, that these things are lapped or whatever.  They – the foreman, who is looking over the hatch, the flagman, everyone knows, so everyone kind of watches for everyone else."[6]  Vanderbrook testified that he had seen crates that have "overlapped and shifted and everything else.  I mean, that's – you don't know, and every ship is a new adventure."[7]  Kenneth L. Crier, the P&O foreman of the crew on the day of Robinson's accident, testified that "it's really common knowledge" that there will be stowage problems in the one and five holds because of the shape of the holds.[8]

Plaintiff argues that the vessel undertook a particular responsibility for cargo stowage because clause 8 of the time charter provides that it is the captain's responsibility to oversee

---

[4] Depo. Cabal (Exhibit 1 to Document 54) at pp. 24-25.

[5] Depo. Vanderbrook (Exhibit 2 to Document 54) at pp. 41-42.  Vanderbrook compared the plywood bundles being placed in the number five hold to "square peg[s]" going in a round hole.  *Id.*

[6] *Id.* at pp. 42-43.

[7] *Id.* at p. 63.

[8] Depo. Crier (Exhibit 3 to Document 54) at p. 31.  Additionally, P.A. Williams, Jr., a P&O longshoreman that was a member of the gang working with Robinson, testified that "many times" he has seen overlapping crates turn over that were stowed on top of each other in the number one and five holds.  Williams testified that when discharging crates from the number five hold, "you got holes all over the hatch," and it was common practice to see bundles of plywood that overlapped.  Depo. Williams (Exhibit 4 to Document 54) at pp. 11-12, 40.

cargo operations. Other Fifth Circuit cases involving clause 8 have examined the vessel's liability under *Scindia* without recognizing that it imposes any additional duties on the vessel.[9]

The court finds that Oldendorff did not breach its *Scindia* duties, and Oldendorff's motion for summary judgment is granted.

### b. Time charterer's motion for summary judgment.

Plaintiff and Pan Ocean both analyze Pan Ocean's potential liability under § 905(b) pursuant to the principles set forth in *Scindia*. However, "[t]he time charterer's duties are different from the vessel owner's duties." *Moore v. Phillips Petroleum Co.*, 912 F.2d 789, 792 (5th Cir. 1990). *Scindia* "does not set the duty of time-charterers." *Kerr-McGee*, 830 F.2d at 1340 n. 8.[10]

The duties of a time charterer "are necessarily limited to those which arise out of and are founded on the relationship which the time-charter establishes between the defendant and the vessel." *Id.* at 1339. Although a time charterer generally "assumes no liability for negligence of the crew or unseaworthiness of the vessel" under the charter, it does owe certain duties to third parties:

> Certainly, the time-charterer has some responsibilities. It designates the cargo that the chartered vessel will carry, and if, for example, it carelessly chooses an unsafe combination of cargo to share the same hold, it could be liable for resulting damages..

---

[9] *See generally Woods v. Sammisa Co., Ltd.*, 873 F.2d 842 (5th Cir. 1989), *cert. denied*, 493 U.S. 1050, 110 S.Ct. 853, 107 L.Ed.2d 847 (1990).

[10] *But see Dahlen v. Gulf Crews, Inc*., 281 F.3d 487, 497 (5th Cir.) (recognizing that *Scindia* and its progeny "does not explicitly apply to time-charterers," but holding that district court did not abuse its discretion by giving jury instruction based *Howlett* because of the lack of cases articulating the duty owed by time-charterers), *cert. denied*, 537 U.S. 1045, 123 S.Ct. 621, 154 L.Ed.2d 518 (2002); *Coleman v. M/V Orhan Ekinci*, 2005 WL 757363, at *6 (E.D. La. March 22, 2005) (citing *Dahlen* and applying *Scindia* duties to alleged negligence of time charterer in connection with loading of cargo).

> The time-charterer directs where and when the vessel will travel, so if it forces it out in hurricane weather or similarly treacherous conditions, it may be liable under section 5(b). But its duties are determined by tradition and agreement.
>
> \* \* \*
>
> There should not be reactive immunity for time-charterers simply because their relationship to the vessel does not rise to the level of owner *pro hac vice*. Neither, however, should there be automatic imposition of liability on time-charterers merely because they are "vessels" under the Act. Instead, we focus on the legal control and responsibility imposed by the particular relationship, and this analysis applies to each type of party defined as a "vessel" in section 2(21).
>
> **We hold that a time-charterer is not liable under section 5(b) unless the cause of the harm is within the charterer's traditional sphere of control and responsibility or has been transferred thereto by the clear language of the charter agreement.**

*Id.* at 1343 (emphasis added). In *Hogden v. Forest Oil Corp.*, 87 F.3d 1512 (5th Cir. 1996), the Fifth Circuit exhaustively analyzed its prior precedent and summarized the time charterer's duties:

> First, in this circuit, . . . a time charter's duties no longer depend on . . . concepts of active and passive negligence. That is, a time charterer may be held liable regardless of whether the vessel owes a primary duty or a high standard of care to the injured plaintiff. Second, a time charterer owes . . . a hybrid duty arising from contract and tort, to persons with whom it has no contractual relationship, including vessel passengers, to avoid negligent actions within the sphere of activity over which it exercises at least partial control. [T]he traditional spheres of activity in which a time charterer exercises control and thus owes a duty include choosing the vessel's cargo, route, and general mission, as well as the specific time in which the vessel will perform its assignment. Third, . . . the parties may vary the traditional assignment of control by contract or custom. Fourth, . . . unless the parties have so varied the traditional allocation of responsibility, a time charterer owes no duty beyond these spheres. Fifth, . . . a time charterer's traditional sphere of control does not extend to providing a safe means of ingress and egress from the vessel, absent special circumstances. Sixth, . . . the fact that a vessel may owe a duty to a third party over a certain sphere of activity does not necessarily mean that this duty is exclusive.

*Id.* at 1520.

Several cases in this circuit have examined these duties in connection with Clause 8 of the New York Product Exchange time charter agreement. A standard form of Clause 8 provided:

> The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, trim, tally, secure, and discharge the cargo at their expense under the supervision of the Captain, who is to sign bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.[11]

In *D/S Ove Skou v. Hebert*, 365 F.2d 341 (5th Cir. 1966), *cert. denied*, 400 U.S. 902, 91 S.Ct. 139, 27 L.Ed.2d 139 (1970), the Fifth Circuit held that this clause "does not give to Time Charterer any operational control over these activities. Rather, these charter party provisions are essentially a specification of the party – owner or charterer – upon whom the ultimate financial cost rests for any one or more of the activities." *Id.; see also Woods v. Sammisa Co., Ltd.*, 873 F.2d 842, 857 (5th Cir. 1989) (holding that under clause 8, "absent evidence to the contrary, the time charterer bears no responsibility to the owner/operator or third parties for the negligent acts of the loading stevedore"), *cert. denied*, 493 U.S. 1050, 110 S.Ct. 853, 107 L.Ed.2d 847 (1990). District courts in this circuit have followed *Ove Skou* and have held that Clause 8, which provides that charterers are to "load" cargo "under the supervision of the

---

[11] Clause 8 of the 1981 Standard New York Produce Exchange Form Time Charter now provides, in similar language:

> The Captain shall prosecute his voyages with due despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners) shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to perform all cargo handling at their expense under the supervision of the Captain, who is to sign the bills of lading for cargo as presented in conformity with mate's or tally clerk's receipts.

*Reprinted in* 3 Thomas J. Schoenbaum, *Admiralty and Maritime Law* Appendix "D," at 1717 (2001).

Captain," does not impose liability on the charterers for a negligent stow.[12]

The time charter in this case, however, differs from the charters construed in *Ove Skou* and its progeny in one important respect. Clause 8 of the Oldendorff - Pan Ocean charter provides:

> The Captain shall prosecute his voyages with due despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners) shall be under the orders and directions of The Charterers as regards employment and agency; and Charterers are to Perform all cargo handling at their ***risk and*** expense under the supervision/responsibility of the Captain, who is to sign the bills of lading for cargo as presented in conformity with mate's or tally clerk's receipts (italics in original).

The italicized word "risk" is not present in Clause 8 of the charters interpreted by established Fifth Circuit jurisprudence, and this is a significant difference:

> In this Circuit, it is well settled that under Clause 8 of the *traditional* New York Produce Exchange form, time charterers bear only the financial responsibility of cargo operations. The Charter Party Agreement in the present action, however, does not include the traditional Clause 8. Instead, the Agreement provides, in relevant part, that:
>
>> Charterers shall perform all cargo and conatiner handling . . . at their risk and expense, under the supervision of the Master, who will remain resonsible for the vessel's seaworthiness in relation to proper stowage of the vessel.
>
> Under this revised Clause 8, the charterer bears not only the expense, but also the "risk" of cargo and container handling. In this Court's view, revised Clause 8 works a sea change in the law of charter party agreements. If not to shift the risk of injuries, why would the tried and true Clause 8 have ever been so modified?

*Wiltz v. Maersk,* 135 F. Supp. 2d 783, 786 (S.D. Tex. 2001) (italics in original).

The court finds that under the terms of Clause 8 of the time charter between Oldendorff and Pan Ocean, Pan Ocean is responsible for any negligent stowage of cargo. In *Cooper*

---

[12] *See Adams v. P.S. Palios*, 1993 WL 460850, at *3 (E.D. La. April 1, 1993); *Corpora v. ABC Ins. Co.,* 1993 WL 43584, at *1 (E.D. La. Feb. 8, 1993); *Bachemin v. Mitsuie and Company (USA), Inc*., 1989 WL 50959, at *3 (E.D. La. May 10, 1989); *Roby v. Hyundai Merchant Marine*, 700 F. Supp. 316, 322 (E.D. La. 1988).

11

*Stevedoring of Louisiana, Inc. v. A.G. Pappadakis*, 363 F.2d 352 (5th Cir. 1966), the Fifth Circuit noted that "Charter-party terms which assign to the charterer the "risk and expense" of loading, stowing, and discharging cargo have definite meaning in the law of admiralty. Such words may limit the shipowner's responsibility for cargo handling, which under British common law was a joint operation of the charterer and the shipowner." *Id.* at 354. Additionally, the term "risk" generally means the "uncertainty of a result, happening, or loss; the chance of injury, damage, or loss, especially the existence and extent of the possibility of harm." *Black's Law Dictionary* 1353 (8th ed. 2004). The court finds there are factual disputes regarding whether the plywood cargo was negligently stowed, and concerning the extent of Pan Ocean's supercargo's participation in loading operations and knowledge of the actions of the loading stevedores. Accordingly, Pan Ocean's motion for summary judgment is denied.

**C.    Conclusion.**

The motion for summary judgment filed by Orient Marine Co., Ltd., Clio Marine, Inc., Oldendorff Carriers GmbH & Co., KG and the United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Limited is granted. The motion for summary judgment filed by defendants Pan Ocean Shipping Co. and the United Kingdom Mutual Steamship Assurance

Association (Bermuda) Limited is denied.

    New Orleans, Louisiana this __3rd__ day of March, 2006.

                                            _____
                                            **Mary Ann Vial Lemmon**
                                            **United States District Judge**